ROBERT H. SPARRE and MADELINE R. SPARRE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sparre v. Comm'r
Docket No. 4845-76. United States Tax Court
T.C. Memo 1980-45; 1980 Tax Ct. Memo LEXIS 538; 39 T.C.M. (CCH) 1044; T.C.M. (RIA) 80045; February 26, 1980, Filed David I. Walsh, for the petitioners. Crombie Garrett, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1971 and 1972 in the amounts of $6,549.92 and $4,090.72, respectively. The parties have settled certain issues, leaving for decision only whether petitioners' net losses from farming and operating a gunning club in the years 1971 and 1972 are deductible as expenses incurred in activities engaged in for profit under section 162(a) [1] or are deductible under sections 212(1) or (2). *540 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Robert H. and Madeline R. Sparre, husband and wife, who resided in Wroton, Maryland, at the time of filing their petition in this case, filed joint Federal income tax returns for the calendar years 1971 and 1972 with the Director of the Internal Revenue Service Center in Philadelphia, Pennsylvania. Mr. Sparre was born and grew up in Wilmingtn, Maryland. His father was a chemist. His father in 1918 purchased a 320-acre farm located in Maryland near Kent County and operated it profitably until his death in 1945. At that time, the farm was sold for considerably more than it had cost. Mrs. Sparre is a native of Kent County and her parents continue to live there in the town of Rock Hall. After World War II, Mr. Sparre for two years worked in his brother-in-law's cannery located in Kent County, Maryland. Petitioner then entered the employ of E. I. DuPont DeNemours & Company (hereinafter DuPont) which was headquartered in Wilmington, Delaware, approximately 50 miles from Kent County, Maryland. In 1952 Mr. Sparre and his wife, Madeline R. Sparre, moved to Kinston, North Carolina, *541 where petitioner helped start and operate a DuPont dacron polyester fibre plant. He was a longrange planner responsible for manufacturing equipment. Both Mr. and Mrs. Sparre hoped eventually to move back to Maryland. Unlike the value of property in the neighboring county in which Mr. Sparre's father had owned a farm, the price of farmland in Kent County had not, through the 1950's, experienced dramatic increases in value. Mr. Sparre, ehowever, believed that such increases would occur in Kent County. He commissioned an old friend, Mr. Coleman, to look for a rundown, neglected piece of property that eventually would provide income. Mr. Coleman was not a practicing real estate salesman, but he did have a real estate license. Additionally, he was a native of Kent County knowledgeable in matters of farming and waterfowl hunting. In 1961 Mr. Coleman found a farm, the Jacobus Creek Farm, in which he believed Mr. Sparre would be interested. It was relatively small, 191 acres. On the farm was a large colonial house built in 1743 and which needed much repair. Additionally, located on the land were a barn, an implement shed, numerous broken down out-buildings and some random fences. *542 The land itself was rundown with a low pH level of around 2.5. The farm had been under cultivation for years. It was not prime farmland but it was good farmland, except for its pH level. To be viable as farmland in Kent County, lime additions to create a pH level of at least 6.5 were needed. There were 40 acres of standing woods, two gravel pits accepted by the State of Maryland as reserves and a seven-acre pond created by a previous owner on the land. The land was hilly and was waterfront property by virtue of a creek running into the Chesapeake Bay. The farm had never been hunted for waterfowl and, in fact, none of the farms in the immediate area had a history of waterfowl hunting. Mr. Sparre was encouraged to purchase the Jacobus Creek Farm by Mr. Coleman. Mr. Coleman believed that the farm income could be supplemented by a gunning club, a waterfowl hunting operation, which would show a profit some 10 to 12 years after it began operation. Waterfowl hunting was used to supplement the grain farming incomes of most farms in Kent County. [2] Mr. Coleman was willing to run the farm and the gunning club for nothing until they became profitable, in which case he would share *543 the profits with Mr. and Mrs. Sparre. Mr. Coleman had been a custom farmer from the 1930's until 1958, when he took a position as a Motor Vehicle inspector for the State of Maryland. He was considered an expert inboth farming and gunning in Kent County. *544 In 1959 the Jacobus Creek Farm had been offered for sale for $45,000, approximately $235 an acre.In 1961 it was offered for $24,000, approximately $125 an acre. Similar quality farmland in Kent County, but not as rundown, was selling for around $200 an acre in 1961. Besides Mr. Coleman's advice, Mr. Sparre spoke with a number of people about purchasing the farm for $24,000. He checked with his brother-in-law who had owned the cannery following World War II and remained in the area; he discussed the proposal with a grain and fertilizer dealer in the area; he talked to two officers in one of the banks in Chestertown, Maryland, and two officers in the Bank of Delaware in Wilmington. Only one of those he spoke with expressed any skepticism. The trust officer of the Bank of Delaware was concerned with the cost of rebuilding the house. In general, however, all agreed that the farm was an attractive buy at $125 an acre. In 1961 petitioners' net worth was approximately $385,000, mostly due to their ownership of DuPont stock. Mr. Sparre's salary in 1961 was $15,288 and he received dividends of $5,606.78 from trust funds set up by his mother's estate. Additionally, he received $8,913.10 *545 in stock dividends. [3] From the sale of stock, petitioners had a short-term capital gain of $10, a long-term capital gain of $343.41, and a capital gain dividend of $.67. Mrs. Sparre had no salary earnings in 1961. [4] In 1961, petitioners had two dependent children. Petitioners' itemized deductions for 1961 were $1,694.49 for interest, $809.97 for contributions, and $1,002.44 for other deductions. Mr. Sparre believed that the farm would, over the years, greatly appreciate and would therefore be an excellent investment. Additionally, he and his wife believed that the farm would eventually be an excellent *546 place for their retirement years. Mr. Sparre hoped that by the time of retirement the farm would supplement his pension, dividend and trust income. He planned to retire in 1978 since he would be permitted to retire prior to reaching age 65 in 1984. Losses in the initial years of operation were expected. Any losses sustained in operating the farm prior to retirement, Mr. Sparre expected to be offset by appreciation of the land which would be enhanced by the farm operations, including the gunning club.For these reasons, Mr. and Mrs. Sparre purchased the Jacobus Creek Farm in April of 1961 for $24,000. Prior to purchasing the farm and up to and including the years spent in North Carolina until he moved back to Delaware in 1966, Mr. Sparre hunted perhaps six times and his wife none. Neither was a hunting enthusiast. In years after 1966, Mr. Sparre may have hunted but it was never a significant activity and his wife never hunted. Mr. Coleman hunted some when he was younger, but has not even purchased a hunting license since 1962. On petitioners' 1961 Federal income tax return, under other deductions in an attachment to Schedule A listing itemized deductions was listed $386 *547 for business travel related to investment property, the farm. On Schedule F of the 1961 return, petitioners set forth the following farm income statement: Sales of Market Livestock and Produce Raised and Held Primarily for sale
Corn
$3,341.38
Farm Expenses
Interest
$1,010.55
Telephone
63.80
Insurance
327.95
Utilities
27.60
Fertilizer
1,328.85
Seed and lime
920.55
Supplies
166.71
Property taxes
243.92
Bad debt - tenant farmer
270.00
Soil conservation
513.75
Supervision
374.84
Cleaning
50.00
Depreciation
323.34
$5,621.86
Net Loss
$2,280.48
Depreciation
Date
Rate
Current
Reserve
Kind of Property
Acquired
%
Cost
Depn.
12-31-61
Tenant house
4-61
5
$6,000
$200.00
$200.00
Storage building
4-61
5
200
6.67
6.67
Shed
1961
5
4,000
50.00
50.00
Barn
1961
5
4,000
66.67
66.67
$323.34
$323.34
No waterfowl hunting occurred on the farm in 1961. The corn farming was done by a farmer hired on a sharecropping basis. Mr. Coleman's management responsibilities in Mr. and Mrs. Sparre's absence were relatively small in 1961; Mr. Sparre kept the books and paid all *548 of the bills. Upon purchase in 1961, the Jacobus Creek Farm could have been leased to a farmer for perhaps $5 an acre, but with the costs of liming the land and insurance such was not a viable alternative at that time. Also, the waterfowl hunting rights could not have been leased to a commercial hunting business because the land had not been built-up for such hunting. Once built-up in later years, the soil for farming and the duck and geese supply for hunting, leasing the land became a viable alternative. In 1962, the farm was operated in the same manner as in 1961. Mr. Sparre's salary from DuPont was $16,896.60. Dividends from stock ownership and trust funds totaled $17,165.92. Petitioners received $191.22 in interest and $231.88 from the DuPont thrift plan. From the distribution of General Motors stock as owners of DuPont stock, petitioners had a net long-term capital gain of $1,190.88. From the sale of bonds, petitioners had a long-term capital gain of $89.45 on gross sales of $20,151.50. Also, petitioners had a capital gain dividend of $.35. Their itemized deductions in 1962 were $2,824.88 for taxes, $1,363.31 for contributions, $2,994.94 for interest (including *549 $1,224.45 which was paid on a loan with respect to the farm from the Chestertown Bank of Maryland), and $1,195.29 for other deductions. Petitioners received a dividend credit of $682.64 in 1962. Petitioners in each of the years 1962 through 1974 had two dependent children. On Schedule F of their 1962 return, petitioners set forth the following farm income statement: Sales of Market Livestock and Produce Raised and Held Primarily for Sale
Grain
$2,258.28
Other Farm Income
Agricultural Program Payments
125.00
Total Income
$2,383.28
Farm Expenses
Labor hired
$ 909.00
Repairs, maintenance
13.04
Fertilizer, lime
528.39
Supplies purchased
1,552.50
Gasoline, fuel, oil
23.54
Taxes
268.16
Insurance
257.95
Utilities
65.39
Conservation expenses
595.82
Travel
400.00
Depreciation [5]
710.00
Total Deductions [6]
$5,323.79
Net Loss
$2,940.51
*550 In 1963, the farm operation was altered. Another farmer was hired to replace the one who had worked in 1961 and 1962. The first farmer had been indifferent toward the work and lived 20 miles from the Jacobus Creek Farm. The new farmer was a neighbor and he also offered to lease petitioners' additional land to be used in the waterfowl hunting club that petitioners established in 1963. The new farmer worked on an hourly basis for petitioners. When petitioners purchased the farm in 1961, Mr. Coleman, among others, had suggested that a gunning club for hunting waterfowl would be a good way to supplement the farm income. In 1961 and 1962, there were a couple of day hunters paying perhaps $10 a day to hunt on the farm, but no club was organized and no attempt was made to operate a commercial gunning operation. Because Mr. Sparre had a small farm of 191 acres, it was his belief that his fixed costs were too high not to supplement the farm income.
Supplementing farming income with waterfowl hunting was and is a common practice in Kent County, which has more waterfowl per square mile than any other county in the United States. Agricultural practices beginning in the 1940's first *551 attracted the waterfowl to the area by providing food in the form of easily attainable seed from grain crops. Federal law sets the waterfowl hunting season as 8 to 12 weeks in the months from October through January, and Maryland State law limits it to Monday through Saturday during the season. In 1961, there were a number of ways to add income with waterfowl hunting on a farm in Kent County. Some farmowners simply rented their waterfowl hunting rights to large commercial operations which leased the rights from a number of tracts of land and rented them in turn to hunters. The income was limited but sure. One drawback was that the waterfowl population might be threatened by the volume of hunting from these commercial leasing operations. Most of these commercial operations did not provide overnight accommodations for the hunters. Some of the hunting operations were run in the form of clubs with prmanent membership fees. Yhese operations required building and keeping a waterfowl population on the fram. This amounted to feeding and raising waterfowl and maintaining ponds. It is a relatively slow and expensive process. Like the commercial operations, few clubs provided overnight *552 accommodations. In 1961, the time expected to turn such a gunning club into a profitable operation was 10 to 12 years. Petitioners were advised that the income potential from such operations, however, was the greatest. Other farmowners, like petitioners in 1961 and 1962, leased to hunters on a daily basis the right to hunt their property. These operations produced less income with their word-of-mouth customers, but were little trouble to operate. Petitioners, pursuant to Mr. Coleman's advice, decided to take the permanent membership approach and produce a high quality gunning club. The quality sought was higher than normal in Kent County. Because their farm was relatively small, it could be hunted only one day a week without harmfully lowering the waterfowl population. Thus, they rented from the farmer engaged in 1963 the hunting rights to a nearby property to give the club two hunting days a week. Unlike the vast majority of hunting operations, petitioners decided that they would provide overnight accommodations at the house and provide breakfast for the hunters. These were added expenses which most farmowners did not choose to be burdened by, but which petitioners hoped *553 to offset with higher membership fees for a quality club providing such additional benefits. The hunting operation was relatively small in 1963 producing only $750 in gross income. Because it was believed that waterfowl hunting was completely intertwined and interdependent with grain farming in Kent County, petitioners never separated the expenses for one from the other. In reporting their farm income on their tax returns, petitioners have always combined the two operations. Although Mr. Coleman's responsibilities grew with the complexity of the operation, he still was not overburdened by the management of the operation. Mr. Sparre continued to do all the bookkeeping and to pay all the bills.
Petitioners were not deterred by the 10- to 12-year expected wait for profits from the hunting operations. Mr. Sparre expected that the expenditures to develop the hunting operation would be more than offset by appreciation in the value of the farm. The most important characteristics of a farm in determining its price in Kent County are first grain production and second the presence of an operating gunning club. Other important characteristics include the residence, fishing, and distance *554 from town. In December of 1963, Mr. Sparre wrote Dr. J. P. Linduska, the director of Wildlife Management for Remington Farms in Chestertown, Maryland. In response to that letter, on December 26, 1963, Dr. Linduska expressed his opinion on the duck shortage then present, agricultural surpluses, and natural production of waterfowl. In 1963, Mr. Sparre's salary from DuPont was $16,926.44. Dividends from stockownership and trust funds totaled $17,841.91. Petitioners earned $62.22 in interest and received $237.13 from the Dupont thrift plan. From sales of stocks and bonds for $43.387.21, petitioners had a $7,514 long-term capital gain. Petitioners in 1963 sold their personal residence with a cost basis of $24,550 for $21,500. Their itemized deductions in 1963 were $3,982.70 for taxes, $1,895.75 for contributions, $6,809.25 for interest and $948.73 in other deductions. From the purchase of new property for $809.04 and used property for $1,200, petitioners received an investment credit on their 1963 return of $84.63. Petitiopners also had received from dividends a credit of $713.68 in 1963. On Schedule F of their 1963 return, petitioners set forth the following farm income *555 statement: Sales of Market Livestock and Produce Raised and Held Primarily for Sale
Grain
$2,733.88
Duck Hunting
750.00
Other Farm Income
Agricultural Program Payments
395.90
Hail Insurance
44.00
$3,923.78
Labor hired
$ 872.00
Repairs, maintenance
278.89
Seed, plaints purchased
405.70
Fertilizers, lime
814.52
Machine hire
472.14
Supplies purchased
44.19
Taxes
33.00
Insurance
497.90
Utilities
191.13
Rent of farm, pasture
650.00
Travel
304.08
Commissions
43.00
Advertising
77.73
Legal
164.26
Depreciation
1.314.77
$6,163.31
Net Loss
$2,239.53
Depreciation Schedule - Farm: Date
Rate
Reserve
Current
Reserve
Acqd.
%
Cost
1-1-63
Depn.
12-31-63
Tenant house
4-61
5
$ 6,000.00
$ 500.00
$ 300.00
$ 800.00
Storage bldg.
4-61
5
200.00
16.67
10.00
26.67
Shed
1961
5
4,000.00
250.00
200.00
450.00
Barn
1961
5
4,000.00
266.67
200.00
466.67
Bldg.
Additions
1963
3
20,031.62
300.48
300.48
Well
1963
10
711.28
35.56
35.56
Fence
1963
10
334.00
16.70
16.70
Tractor - used
1963
20
1,172.00
117.20
117.20
Furnishings
1963
10
1,721.73
86.09
86.09
Sewage system
1963
10
222.49
11.12
11.12
Equipment
1963
10
752.41
37.62
37.62
Total
$39,145.53
$1,033.34
$1,314.77
$2,348.11
*556 A letter dated April 8, 1964, was sent to Mr. Sparre by Mr. William O. Coon, a naturalist and game food expert for Game Food Nurseries in Oshkosh, Wisconsin. It acknowledged receipt of payment for Wampee Duck Corn seed, Wapato Duck Potato Tubers, Wild Millet and Reed Canary Grass seed, Nodding Smartweed Roots, Burreed Roots, Wild Rice, Wild Celery Tubers, Pondweed Tubers and Deep Water Duck Potato Tubers. Attached to the letter, a copy of which was sent to Mr. Coleman by Mr. Coon, were planting instructions to be followed that spring. Also in that letter, Mr. Coon offered Mr. Sparre a 50 percent reduced price for the fall order of similar plants. A letter dated September 29, 1964, was sent to Mr. Sparre by Mr. John R. Jewell, Commissioner of the State of Maryland Department of Motor Vehicles. In pertinent part, it read as follows: I am at a loss to advise you of someone who might be competent to properly survey your farm operations and set up a profitable program. However, I would suggest that you might have Dinky ask the County Agent for assistance -- through this means something might develop. As to a real sharp tax man, I could only recommend Snouffer and Company, *557 Oldtown Bank Building, Baltimore, Maryland, as they have been my accountant for more than fifteen years. Should you care to contact the Snouffers, I would suggest that you direct your correspondence to the attention of Mr. Roy Snouffer, who is not only a certified public accountant, but also an attorney. A letter dated October 9, 1964, was sent to Mr. Sparre by Mr. Howard Zeller, a wildlife field superintendent for the Game and Inland Fish Commission. It read as follows: Upon receiving your letter of January 22 to Mr. Kerns, we visited your farm in Kent County and went over same for game management suggestions with your local agent. After receiving your second letter of September 23 we again visited the farm with your agent, Mr. James Coleman. Some of the game habitat plantings recommended earlier were delayed due to the extreme drought conditions which prevailed this season. The earth-moving operations incidental to the construction of a planned second pond also delayed some habitat planting until its completion. Mr. Coleman plans to complete all of these practices by late spring and we have made arrangements to cooperate with him. I think you have already done a good *558 job on waterfowl, so most of our recommendations were to work good upland game habitat into your existing waterfowl plans. The large waterfowl impoundment is one of the best in this area. A letter dated October 14, 1964, was sent to Mr. Sparre by John New, Jr., of Starkey Farms Company of Galena, Maryland. It read as follows: Your problem is the same as all absentee owners of relatively small farms. It is impossible to make a sufficient return to employ a top man to manage for you at a salary high enough to let you out without subsidizing the operation. In addition any other crops except corn, grain, or beans will necessitate a large investment in equipment and buildings, this would take a long time to recover from 200 acres. All you can expect from your present setup is sufficient income to carry the property (taxes, maintenance, and 3% on your investment) and wait for appreciation of property value to make a profit when you sell, from a capital gain tax situation. I will be glad to go over the property with you the next time you are here and discuss all of the possibilities that I am familiar with, this may be of some help in making your decision. In 1964, Mr. *559 Sparre's salary from DePont was $17,966.13. Dividends from stock ownership and trust funds totaled $16,955.08. Petitioners earned $62.40 in interest. From direct sales of stock, petitioners had a short-term capital loss of $64.08 on gross sales of $3,490.92 and a long-term capital gain of $1,534.69 in connection with the distribution of General Motors stock by DuPont. From trust distributions, petitioners had a short-term capital gain of $178.06 and a long-term capital gain of $43,903.23 Additionally, they received from General Motors stock distributions $28.44 in a net short-term capital gain and $3,555 in a long-term capital gain. Their itemized deductions in 1964 were $1,066.78 for contributions, $3,739.50 for taxes, $6,564.04 for interest, and $1,000.10 in other deductions. From the purchase of new property for $521.05 and used property for $605.60, petitioners received an investment credit on their 1964 return of $50.60. On Schedule F of their 1964 return, petitioners set forth the following farm income statement: Sales of Market Livestock and Produce Raised and Held Primarily for Sale
Duck Hunting
$2,045.00
Other Farm Income
Agricultural Program Payments
253.00
Feed Grain Program
305.00
$2,603.00
Farm Expenses
Labor hired
$ 559,13
Repairs, maintenance
1,165.76
Seed, plants purchased
314.06
Fertilizers, lime
224.74
Machine hire
50.00
Supplies purchased
1,990.89
Gasoline, fuel, oil
160.31
Taxes
524.17
Insurance
416.50
Utilities
416.94
Rent of farm, pasture
1,150.00
Freight, trucking
489.58
Conservation expense
650.75
ASC payment
180.12
Dues & sub.
23.0 *
(not legible)
88.1 *
Miscellaneous
122.0 *
Depreciation
2,311.49
$10,837.59
Net Loss
$8,234.59
*560 Depreciation Schedule - Farm: Description
Date
Reserve
Current
Reserve
of Property
Acqd.
Rate
Cost
1-1-64
Depn.
12-31-64
Tenant House
4-61
5
$ 6,000.00
$ 800.00
$ 300.00
$1,100.00
Storage Bldg.
4-61
5
200.00
26.67
10.00
36.67
Shed
1961
5
4,000.00
450.00
200.00
650.00
Barn
1961
5
4,000.00
466.67
200.00
666.67
Bldg.
Additions
1963
3
20,031.62
300.48
600.95
901.43
Well
1963
10
711.28
35.56
71.28
106.84
Fence
1963
10
334.00
16.70
33.40
50.10
Tractor-used
1963
20
1,200.00
117.20
240.00
357.20
Furnishings
1963
10
1,721.73
86.09
172.17
258.26
Sewage System
1963
10
222.49
11.12
22.25
33.37
Equipment
1963
10
809.04
37.62
80.90
118.52
Rotary cutter
1964
10
521.05
26.05
26.05
Equipment
1964
20
605.60
60.56
60.56
Duck supplies
1964
33-1/3
1.109.94
184.99
184.99
Bldg.
additions
1964
3
7,262.44
108.94
108.94
$48,729.19
$2,348.11
$2,311.49
$4,659.60
In 1965, Mr. Sparre's salary from DuPont was $18,700.63. Dividends from stock ownership and trust funds totaled $17,380.26. Petitioners earned $139.37 in interest *561 and received $235.38 from the DuPont thrift plan. From sales of stock, petitioners had $615.50 of short-term capital gain on gross sales of $43.603.47 and a $3.708.89 long-term capital gain on gross sales of $5,150.75. Petitioners realized a $42,603.72 long-term capital gain upon receipt of General Motors stock as a result of DuPont's divestiture of its General Motors stock. They also had $49.51 in long-term capital gains from trust distributions. Their itemized deductions in 1965 were $3,077.55 for contributions, $5,803.98 for taxes, $6,761.49 for interest, and $823.56 for other deductions. From the purchase of new property for $32.91 and used property for $862.67, petitioners received an investment credit on their 1965 return of $22.43. On Schedule F of their 1965 return, petitioners set forth the following farm income statement: Sales of Market Livestock and Produce Raised and Held Primarily for Sale
Grain
$5,713.47
Duck Hunting
3,867.00
Other Farm Income
Agricultural Program Payments
304.50
$9,884.97
Farm Expenses
Labor hired
$ 2,749.19
Repairs, maintenance
802.97
Feed purchased
19.30
Seeds, plants purchased
1,512.49
Fertilizers, lime
2,744.61
Supplies purchased
1,199.99
Veterinary, medicine
11.00
Gasoline, fuel, oil
653.46
Taxes
431.26
Insurance
207.58
Utilities
514.92
Rent of farm, pasture
400.00
Conservation expenses
2,471.24
Dues and Sub
6. **
Travel
470. **
Advertising
241. **
Poison
95. **
Licenses
80. **
Depreciation
3,309.24
$17,921. **
Net Loss
$8,036.30
*562 Depreciation Schedule - Farm: Description
Date
Rate
Reserve
Current
Reserve
of Property
Acqd.
(%)
Cost
1-1-65
Depn.
12-31-65
Tenant house
4-61
5
$ 6,000.00
$1,100.00
$ 300.00
$1,400.00
Storage bldg.
4-61
5
200.00
36.67
10.00
46.67
Shed
1961
5
4,000.00
650.00
200.00
850.00
Barn
1961
5
4,000.00
666.67
200.00
866.67
Bldg.
additions
1963
3
20,031.62
901.43
600.95
1,502.38
Well
1963
10
711.28
106.84
71.13
177.97
Fence
1963
10
334.00
50.10
33.40
83.50
Tractor-used
1963
20
1,200.00
357.20
240.00
597.20
Furnishings
1963
10
1,721.73
258.26
172.17
430.43
Sewage system
1963
10
222.49
33.37
22.25
55.62
Equipment
1963
10
809.04
118.52
80.90
199.42
Rotary cutter
1964
10
521.05
26.05
52.11
78.16
Equipment
1964
20
605.60
60.56
60.56
121.12
Duck Supplies
1964
33-1/3
1,109.94
184.99
369.98
554.97
Bldg.
additions
1964
3
7,262.44
108.94
217.87
326.81
Furnishings -
used
1965
20
743.23
74.32
74.32
Used lawnmower
1965
20
122.44
12.24
12.24
Trap house
1965
10
269.05
13.45
13.45
Decoys
1965
33-1/3
806.55
268.85
268.85
Bldg.
additions
1965
3
1,160.52
17.41
17.41
Filing cabinet
1965
10
32.91
1.65
1.65
Chevy truck -
used
1965
33-1/3
1.840.00
290.00
290.00
$53,703.89
$4,659.60
$3,309.24
$7,968.84
*563 Mr. Sparre was transferred back to Wilmington, Delaware, by the DuPont Company in 1966. Petitioners moved to Wilmington in July of that year and began spending weekends at the farm which was some 55 miles from Wilmington. Thus, petitioners changed their allocation of farm maintenance expenses from 100 percent business to 50 percent business. In 1966, Mr. Sparre's salary from DuPont was $26,904. Dividends from stock ownership and trust funds totaled $14,805. Petitioners earned $195 in interest.From sales of stocks petitioners had short-term capital losses of $41 on gross sales of $1,119 and long-term capital gains of $5,210 on gross sales of $16,257. From trust distributions, petitioners had loing-term capital gains from the sale of stock amounting to $22,253. From the sale of their personal residence in Kingston, North Carolina, petitioners suffered a $12,000 loss. Petitioners' itemized deductions in 1966 were $6,948 for taxes, $1,383 for contributions, $10,374 for interest and $602 in miscellaneous deductions. On Schedule F of their 1966 return, petitioners set forth the following income statement: Sales of Market Livestock and Produce Raised and Held Primarily *564 for Sale
Grain
$ 3,745
Other Farm Income
Gun Club
5,000
$ 8,745
Farm Expenses For Taxable Year
Labor hired
$5,593
Repairs, maintenance
2,399
Seed, plants purchased
679
Fertilizers, lime
4,170
Supplies purchased
3,542
Gasoline, fuel, oil
148
Insurance
1,232
Utilities
212
Rent of Farm, pasture
1,350
Freight, trucking
551
Exterminating
252
License
54
Telephone
327
Sales tax
198
Advertising
209
Depreciation
4,298
$25,214
Net Loss
$16,469
Depreciation Schedule
Depn.
Method
Depn.
Cost or
allowed
of
Rate(%)
for
Date
other
in prior
Com-
or life
this
Kind of Property
Acqd.
basis
years
puting
years
year
Tenant House
4-61
$ 6,000
$1,400
SL
5%
$ 300
Storage Bldg.
4-61
200
47
SL
5%
10
Shed
1961
4,000
850
SL
5%
200
Barn
1961
4,000
867
SL
5%
200
Bldg. Additions
1963
20,032
1,502
SL
3%
601
Well
1963
711
178
SL
10
71
Fence
1963
334
84
SL
10
33
Tractor - used
1963
1,200
597
SL
20
240
Furnishings
1963
1,722
430
SL
10
172
Sewage system
1963
222
56
SL
10
22
Equipment
1963
809
199
SL
10
81
Rotary cutter
1964
521
78
SL
10
52
Equipment
1964
606
121
SL
20
61
Duck supplies
1964
1,110
555
SL
33-1/3
370
Bldg. Additions
1964
7,262
327
SL
3
218
Furnishings
1965
743
74
SL
20
149
Lawnmower
1965
122
12
SL
20
24
Trap House
1965
269
13
SL
10
27
Decoys
1965
807
269
SL
33-1/3
269
Bldg. Additions
1965
1,161
17
SL
3
35
Filing Cabinet
1965
33
2
SL
10
3
Chevy truck
1965
1,840
290
SL
33-1/3
613
Jeep
1966
289
SL
33-1/3
96
Club House
1966
15,018
SL
3
451
Total Depreciation
$69,011
$7,968
$4,298
*565 Petitioners in 1967 twice advertised the gunning club in the Wall Street Journal and once in the Kent Shoreman, a monthly publication.In 1967 and 1968, petitioners notified the following parties about the availability of the gunning club and the farm for rental to business groups or vacationers: Chestertown Chamber of Commerce, J. E. Ball Realtors, Easton, Maryland; Connellee Cooper-Barroll Realtors, Chestertown, Mrs. M. W. Perkins, Realtor, Chestertown. A letter dated February 17, 1967, was sent to Mr. Sparre by Mr. John B. Jessup, Jr., for J. E. Ball Associates, Realtors, in Easton, Maryland. It noted Mr. Sparre's previous communication with Mr. Jessup and Mr. Jessup offered to recommend new members for the gunning club. He noted that a brochure would be helpful. With respect to Mr. Sparre's request for assistance in finding a summer lessee for the farm, Mr. Jessup suggested that Mr. Sparre Speak with a local real estate agent--Mrs. Margaret Perkins of M. W. Perkins and Associates in Chestertown, Maryland. Mr. Sparre sent a letter dated March 9, 1967, to Mr. A. A. Bauer in Philadelphia, Pennsylvania, confirming a telephone conversation of that date. Mr. Sparre offered *566 to purchase unclaimed grain for waterfowl feeding if Mr. Bauer's company had any in the Chestertown area. A description of the farm dated March 31, 1967, was prepared and concluded with the following paragraph: Why is Jacobus available for rental? This farm was purchased originally as an investment and as a retirement home by a Du Pont Company Manufacturing Supervisor and his family. Starting in 1962 we began to manage and capitalize on the fine goose and duck shooting possibilities.The place has been used from November through the first week in January by an exclusive gunning club. The owner and family live in Wilmington, Delaware, and come down only on weekends. We like to share the pleasures of this retreat and we believe there are some discerning people who like to get away from the city without suffering the crowded conditions of resorts. A letter dated July 20, 1967, was sent to Mr. Sparre by Mr. J. A. Weamert, Extension Agent of Agricultural Science at the Cooperative Extension Service of the University of Maryland in Chestertown. The letter responded to Mr. Sparre's concerns about the growth of Kudzu on the farm and the profitability of growing corn. Mr. Weamert *567 encouraged Mr. Sparre in his corn production activity. He declared that in his opinion any farm properly managed in Kent County could make a profit on corn production. In 1967, Mr. Sparre's salary from DuPont was $20,047. Dividends from stock ownership and trusts totaled $12,497. Petitioners earned $94 in interest. From sales of stock, petitioners had short-term capital gains of $7,639 on gross sales of $36,414 and short-term capital losses of $1,537 on gross sales of $14,692. From trust distributions, petitioners had long-term capital gains of $75. Their itemized deductions in 1967 were $120 for medical expenses, $2,665 for taxes, $2,059 for contributions, $10,734 for interest, and $1,671 for miscellaneous deductions. On Schedule F of their 1967 return, petitioners set forth the following farm income statement: Sales of Market Livestock and Produce Raised and Held Primarily for Sale
Grain
$ 7,258
Vegetables
30
Other Farm Income
Gun Club
4,300
$11,588
Farm Expenses for Taxable Year
Labor hired
$ 3,231
Repairs, maintenance
1,925
Feed purchased
945
Seed, plants purchased
1,571
Fertilizers, lime
1,642
Machine hire
2,249
Supplies purchased
5,408
Gasoline, fuel, oil
682
Insurance
1,447
Utilities
352
Rent of farm, pasture
1,700
Legal
141
Sales tax
171
Telephone
239
Office
50
Depreciation
4,304
$26,057
Net Loss
$14,469
*568 Depreciation Schedule
Depn.
Method
Depn.
Cost or
allowed
of
Rate(%)
for
Date
other
in prior
Com-
or life
this
Kind of Property
Acqd.
basis
years
puting
years
year
Tenant House
4-61
$ 6,000
$1,700
SL
5%
$ 300
Storage Bldg.
4-61
200
57
SL
5%
10
Shed
1961
4,000
1,050
SL
5%
200
Barn
1961
4,000
1,067
SL
5%
200
Bldg. Additions
1963
20,032
2,103
SL
3%
601
Well
1963
711
249
SL
10%
71
Fence
1963
334
117
SL
10%
33
Tractor - used
1963
1,200
837
SL
20%
240
Furnishings
1963
1,722
602
SL
10%
172
Sewage system
1963
222
78
SL
10%
22
Equipment
1963
809
280
SL
10%
81
Rotary cutter
1964
521
130
SL
10%
52
Equipment
1964
606
182
SL
10%
61
Duck Supplies
1964
1,110
925
SL
33-1/3%
185
Bldg. Additions
1964
7,262
545
SL
3%
218
Furnishings
1965
743
223
SL
20%
149
Lawnmower
1965
122
36
SL
20%
24
Trap House
1965
269
40
SL
10%
27
Decoys
1965
807
538
SL
33-1/3%
269
Bldg. Additions
1965
1,161
52
SL
3%
35
Filing Cabinet
1965
33
5
SL
10%
3
Chevy truck
1965
1,840
903
SL
33-1/3%
613
Jeep
1966
289
96
SL
33-1/3%
96
Club House
1966
15,018
451
SL
3%
451
Decoys
10-14-67
389
SL
33%
30
Basement Floor
2-28-67
975
SL
10%
80
Furniture
5-11-67
200
SL
10%
16
Furniture
4-3-67
160
SL
10%
9
Outboard Motor
4-3-67
300
SL
33%
45
Bldg. Improve-
ments
8-23-67
545
SL
3%
3
Bldg. Improve-
ments
5-10-67
560
SL
3%
8
Storn Windows
12-18-67
278
SL
10%
$72,418
$12,266
$4,304
*569 In 1968, Mr. Sparre's salary from DuPont was $20,990. Dividends from stock ownership and trust funds totaled $13,169. Petitioners received $102 in interest. From the sale of stocks, petitioners had short-term capital gains of $199 on gross sales of $54,993 and long-term capital gains of $5,782 on gross sales of $10,458. Their itemized deductions in 1968 were $3,562 for taxes, $874 for contributions, $12,242 for interest and $1,017 for miscellaneous deductions. On Schedule F of their 1968 return, petitioners set forth the following farm income statement: Sales of Market Livestock and Produce Raised and Held Primarily for Sale
Grain
$ 3,869
Other Farm Income
Gun Club
4,500
$ 8,369
Farm Expenses for Taxable Year
Labor hired
$ 953
Fertilizers, lime
5,454
Machine hire
3,096
Supplies purchased
4,682
Gasoline, fuel, oil
135
Taxes
677
Insurance
1,055
Utilities
873
Rent of farm, pasture
1,500
Miscellaneous
320
Depreciation
3,921
$22,666
Net Loss
$14,297
Depreciation
Depn.
Method
Depn.
Cost or
allowed
of
Rate(%)
for
Date
other
in prior
Com-
or life
this
Kind of Poperty
Acqd.
basis
years
puting
years
year
Bldgs. and
Improvements
Var.
$59,753
$9,131
SL
Var.
$2,146
Equipment-Etc.
Var.
16,078
7,439
SL
Var.
1,775
$75,831
$3,921
*570 In the 1969 Farm and Ranch Vacation Guide published by Rand McNally, the Jacobus Creek Farm was named as a vacation farm for rent from February to October. The person to contact was Mr. Sparre. Petitioner in 1969 received and responded to two inquiries concerning vacation rental of the farm; however, the farm was never rented. After 1969, petitioners did not advertise for renters of the farm as a summer vacation home or for gunning club members. Such advertising had never produced a renter or gunning club member. In 1969, Mr. Sparre's salary from DuPont was $21,637. Dividends from stock ownership and trust funds were $11,063. Petitioners received $216 in interest. From the sale of stock, petitioners had short-term capital losses of $775 on gross sales of $13,878 and long-term capital losses of $1,952 on gross sales of $27,618. Petitioners had miscellaneous income of $99 from a trust and $486 from the DuPont bonus plan. Their itemized deductions in 1969 were $2,697 for taxes, $1,351 for contributions, $5,117 for interest, and $959 for miscellaneous deductions.
On Schedule F of their 1969 return and accompanying statements, petitioners set forth the following farm income *571 statement: Sales of Market Livestock and Produce Raised and Held Primarily for Sale
Grain
$ 3,874
Other Income
Gunning Club Dues
7,225
Patronage Dividends
5
$11,104
Farm Deductions
Labor hired
$ 1,254
Interest [7]
4,153
Seeds, plants purchased
5,260
Supplies purchased
1,051
Gasoline, fuel, oil
685
Taxes
539
Utilities
686
Feed and decoy
1,937
Hardware and lumber
577
Groceries
778
Carpentry
951
Auto-Tractor parts
316
Tires
326
Lawn service
1,147
Miscellaneous
2,061
Gifts (3)
75
Supervisory Travel
300
Depreciation
3,712
$25,808
Net Loss
$14,707
Depreciation
Depn.
Method
Depn.
Cost or
allowed
of
Rate(%)
for
Date
other
in prior
Com-
or life
this
Kind of Porperty
Acqd.
basis
years
puting
years
year
Furniture
1969
$ 228
SL
10
$ 23
Ponds
1969
950
SL
10
95
Improvements
1969
1,036
SL
10
104
Survey
1969
2,063
Bldg. and
Improvements
59,753
$11,277
2,146
Equipment
16,078
9,214
1,203
Decoys
1969
423
SL
.3333
141
$3,712
*572 A draft, dated July 22, 1970, of a memorandum to Mr. Coleman from Mr. Sparre reads as follows: COST REDUCTIONS
Businesses that stay alive these days are hard at work finding large and small cost reductions. Du Pont and other companies have found long ago that you can't depend on large, dramatic reductions to get you out of trouble. People wait too long for the big ticket item that never comes or comes too late. The secret is to pick at the cost structure continuously, a little here and a little there. Smart businessmen are savvy enough to know that you can go too far along this road, however. You can get so obsessed with reducing costs that the outgoing product is cheapened and you lose your customers. You can't provide an inferior service these days. So, the businessman who stays on top spends whatever time and money is necessary to provide a good product or service, but is constantly on the lookout for ways to reduce the cost without sacrificing quality. The dummy is the one (like U.S. Steel) who doesn't know any other way to stay in business but to raise his prices. We have the same sort of obligation and challenge with the Farm, and more particularly, *573 the Gunning Club operation. Nobody can accuse us of doing the same things the same way, spending a lot of money needlessly, year after year. We are always finding wasys to cut costs and increase outr chances of financial success. We are always experimenting to see if the "old ways" are actually the "best ways". And, we have been pretty successful. We need to keep on experimenting so that we cannot be judged to be looking for perfection, as you would in a hobby, without regard for whether the money really earns a return. In other words; if you can provide just as good a product at less cost, you'd better do it. Here are some of the things we have done in recent years: 1. Reduced the amount of acreage planted in corn. (See also #7). a. Withdraw the non proctive * acres. b. Plant the non productive * acres in trees and grasses. 2. Reduced the number of *mallards raised. 1970 plans were *574 to raise 800, but we reasoned that 600 would be adequate. Next year we will reduce to 400 since the resident population has increased, as a result of our efforts, and the Canadian breeding is much improved. 3. Allowed half of the clipped-wing Canada Geese to revert to the wild as their feathers grew to avoid feeding 20 more geese year-round. We also opened up and reseeded more grasslands for the remaining geese to reduce the dependence on expensive corn in the Spring and Summer. 4. Eliminated Bay Duck shooting in 1969 and 1970 entirely. Reduced operating costs by about $2500 a year. 5. Reduced heating and light expense for the past 2 years. You have cut back heat to minimum and all lights off when you leave the building. We have also asked Club Members to assist in cutting, hauling and stocking fireplace wood to save this lumber cost. 6. Yard labor has been essentially disposed of by my doing the work of cleaning the barn and other menial tasks that for years were done by Oliver Wilson.
7. Plant 20 acres in cheaper to raise Soya Beans instead of corn in 1970. There aren't very many other places I knew of to look. There are a couple we should at least consider *575 this year and next. You are the expert in this area, but I think the questions should be asked even though your judgment says there is nothing that can be done. A. "Bushel of corn = a bushel of geese. Ten bushels of corn = 10 bushels of geese". For 5 years, this has been our philosophy for feeding before and after the season. During these 5 years we have had anywhere from an "abundance" of geese to a "fair crop" with the same amount of corn being used every year. It seems to me that once you put out a certain amount, anything over that amount probably doesn't do much good.Why not experiment with 1 less bucket per farm per day in the Fall and early Spring. B. "Ducks raised in captivity will perish if left to their own devices after the wild ones migrate back North in the Spring". This is true in Spring: March, April, May, but it sure shouldn't be true in Summer when the old - last year's - ducks can eat grass, bugs, etc. We should only feed them enough to keep them on the Farm.You have started on that this year, by more infrequent feedings. We should certainly do more cutting back here next year. C. Raising Mallards on the ponds. There are hundreds of Mallards raised in the wild around us each year. More each year. They would benefit greatly from a growing mash feed, perhaps, but they made out pretty well without it. The ones we raise in the Barn are nowhere near as hardy or as smart, but I can't for the life of me see spending $6 a bag at a bag a day after the ducks are fully feathered. We might only save about $100 in feed bill, but it's too big an item to ignore. *576 In 1970, Mr. Sparre's salary from DePont was $21,927. Dividends from stock ownership and trust funds totaled $9,964. Petitioners received $84 in interest.From rental of a dwelling, petitioners had $770 in rental income with $625 of depreciation and $1,089 of other expenses with respect to the rent. From trust distributions other than dividends, petitioners received $210. Petitioners also received $21 as a refund of taxes from the State of Delaware and $489 from cancellation of life insurance. From the sale of stock, petitioners had short-term capital losses of $206 on gross sales of $1,643 and net long-term capital losses of $284 on gross sales of $3,294. Their itemized deductions in 1970 were $1,004 for taxes, $1,016 for contributions, $6,056 for interest, $872 *577 for miscellaneous deductions and $12 for medical expenses. On Schedule F of their 1970 return and accompanying statements, petitioners set forth the following farm income statement: Sales of Market Livestock and Produce Raised and Held Primarily for sale and Other Farm Income
Soy Beans
$ 2,324
Corn
3,633
Other Farm Income
Dues - Gunnery
7,750
$13,707
Farm Expenses
Labor hired
$ 647
Repairs, maintenance
543
Interest
4,434
Rent of farm, pasture
52
Seeds, plants purchased
7,762
Gasoline, fuel, oil
1,033
Taxes
614
Insurance
1,002
Utilities
392
Decoy expense
846
Lumber
186
Groceries
1,040
Carpentry
2,137
Lawn service & supplies
197
Miscellaneous
131
Gifts (3)
60
Telephone
298
Laundry
12
R & M - Equipment
832
R & M - Gun Club
33
Club supplies
345
Painting
82
Animal expense
398
Depreciation
3,631
$26,707
Net Loss
$13,000
Depreciation
Depn.
Method
Depn.
Cost or
allowed
of
Rate(%)
for
Date
other
in prior
Com-
or life
this
Kind of Property
Acqd.
basis
years
puting
years
year
Furniture
1969
$ 228
$ 23
SL
10
$ 23
Ponds
1969
950
95
SL
10
95
Improvements
1969
1,036
104
SL
10
104
Survey
1969
2,063
Bldg. and
Improvements
59,753
13,423
SL
2,146
Equipment
16,078
10,417
SL
1,088
Decoys
1969
423
141
SL
.3333
141
Ponds
1970
680
SL
10
34
$3,631
*578 In 1971 and 1972, Mr. Sparre continued his employment with DuPont as a training supervisor. Petitioners' two children attended private schools in the Wilmington area during 1971 and 1972. The gunning club in 1971 and 1972 was limited to 11 hunters, including two guides, at any one time. [8] The guides were local hunters who were paid about $125 a week during the season. Club members had rights to hunt two days a week during the season and the members stayed at the farm residence on days of the hunt. When club members stayed at the house, often times including the night before the hunt, Mrs. Sparre would stay with her parents some 20 miles away. Petitioners were able to supply the second hunting day by renting 200 adjacent acres for use by the gunning club for $1,000 in 1971 and $1,500 in 1972. Mr. Sparre's brother, Mr. F. Dallas Sparre, was a member of the club in both 1971 and 1972 and paid full dues of $1,150 each year. *579 In 1971, according to petitioners' Federal income tax return, Mr. Sparre's salary from DuPont was $23,306. Dividends from stock ownership and trust funds totaled $9,109. Trust income other than capital gains or dividends totaled $1,551. Petitioners received $200 in interest. They received $358 from rental of a residence in Wilmington with depreciation expenses of $425, advertising expenses of $552 and interest expenses of $536. From the sale of land at a gross sales price of $2,237 and the sale of stock at a gross sales price of $8,876, petitioners had a long-term capital gain of $496. [9] From the sale of stock at a gross sales price of $17,736, petitioners reported a short-term capital gain of $2,976. Petitioners' share of long-term capital gains from fiduciaries totaled $2,818. Petitioners received $655 as a State income tax refund and $274 as a property tax refund. *580 Itemized deductions on their Federal income tax return for 1971 were $12 for medical expenses, $1,814 for taxes, $1,856 for contributions, $5,907 for interest, and $813 for miscellaneous deductions. From the purchase of new property for $593, petitioners received an investment credit on their 1971 return of $42. On Schedule F of their 1971 return and accompanying statements, petitioners set forth the following farm income statement: Sales of Market Livestock and Produce Raised and Held Primarily for Sale and Other Farm Income
Beans
$ 2,133
Corn
1,077
Other Farm Income
Gunning Club dues
5,000
Agricultural program payments
1,001
$ 9,211
Farm Expenses
Labor hired
$ 1,687
Repairs, maintenance
806
Interest
4,148
Rent of farm, pasture
1,500
Feed purchased
1,190
Seed, plants purchased
9,105
Supplies purchased
1,417
Gasoline, fuel, oil
1,440
Taxes
702
Insurance
1,628
Utilities
794
Conservation expenses
734
Home and Lumber
345
Groceries - Gun Club
262
Repairs--Roads and Ponds
3,131
Stamps
50
Miscellaneous
375
Car Mileage
360
Depreciation
3,661
$33,335
Net Loss
$24,124
Depreciation
Depn.
Method
Depn.
Cost or
allowed
of
Rate(%)
for
Date
other
in prior
Com-
or life
this
Kind of Property
Acqd.
basis
years
puting
years
year
Furniture
1969
$ 228
$ 23
SL
10
$ 23
Ponds
1969
950
95
SL
10
95
Improvements
1969
1,036
104
SL
10
104
Survey
1969
2,063
Bldg. and
Improvements
59,753
13,423
SL
2,146
Equipment
16,078
10,417
SL
1,088
Decoys
1969
423
141
SL
.3333
141
Ponds
1970
680
SL
10
34
Equipment
7-1-71
593
SL
10
30
$3,661
*581 In Nov. of 1972, Mr. Sparre prepared and following financial statement: Bank: Chestertown Bank of Maryland
Date: 11/27/72 Name: Robert H. Sparre ASSETS
Cash on hand and in banks (A)
$ 1,000.00
U.S. Government securities (B)
Other stocks and bonds (B)
285,000.00 * * *
Real estate (D)
218,000.00
Automobiles
2,000.00
Automobiles
2,000.00
Cash value of life insurance (E)
3,000.00 * * *
Total assets
$508,000.00 [sic]
CONTINGENT LIABILITIES
None LIABILITIES AND NET WORTH
Notes due to banks (A)
$26,000.00
Notes due to relatives and
friends (F)
Notes due to others (F)
2,000.00 * * *
Real estate mortgages payable (D)
70,000.00
Borkers margin accounts
25,000.00 * * *
Total liabilities
$123,000.00
ANNUAL INCOME
Salary
$ 23,000.00
Commissions and bonuses
2,000.00
Dividends
8,000.00 * * *
Other: Farm - Gunning Club
1,000.00 (1972 Est.)
(A) CASH IN BANKS AND NOTES DUE TO BANKS
On
Name of Bank
Deposit
Due Banks
Collateral (If Any)
Peoples Bank - Chestertown
None
$17,000.00
None
Chestertown Bank of Md.
$100
6,000.00
None
Bank of Delaware
900
None
Credit Cards
3,000.00
None
Total
$26,000.00
*582 (B) U.S. GOVERNMENT SECURITIES AND OTHER STOCKS AND BONDS
No. of Shares or
Market
Face Value (Bonds)
Description
Cost
Value
649
E. I. duPont Common
Zero
$100,000
Various
Trust - Bank of
Assorted
185,000
Delaware (see attached
accounting)
(C) ACCOUNTS AND NOTES RECEIVABLE
None (D) REAL ESTATE Mortgage
Date
Title in
Present
How
Description
Acqd.
Whose Name
Cost
Value
Amount
Payable
Farm Worton, Md.
1961
Sparre
$24,000
$200,000
$70,000
Quarterly
Lot-Langford Bay
1960
Sparre
2,000
8,000
Lots-Rock Hall,
Md.
1964
Roch/Sparre
6,500
10,000
Total
$218,000
(E) LIFE INSURANCE
Cash
Amount
Name of Company
Beneficiary
Value
Loans
$75,000
Travelers - Co. Sponsored
Estate
None
None
3,000
Equitable
Estate
None
None
70,000
Travelers
Estate
$11,000
$8,000
(F) NOTES, CONTRACTS, ACCOUNTS, AND BILLS DUE
Purpose or
Collateral
Owed To
Date
Balance Due
When Due
(If Any)
DuPont Glori Forgan
1972
$25,000
Margin Acct.
649 Shares
(Stockbroker)
duPont Common
Misc. Farm Bills
1972
2,000
Dec. '72
No Collateral
*583 In 1972, according to petitioners' Federal income tax return, Mr. Sparre's salary from DuPont was $23,894.09. Dividends from stock ownership and trust funds totaled $7,306.32. They received $155.89 in interest. From a cattle partnership, petitioners had a $6,004 loss. From two trusts at the Bank of Delaware, they had income of $3,354.22. From trust distributions, petitioners had $7.04 of short-term capital loss and $2,164.22 of long-term capital gain. From the sale of land in Maryland for a gross sales price of $9,737.56, petitioners had a long-term capital gain of $5,337.56. Additionally, petitioners had long-term capital gains of $21,854.70 from gross sales of stock for $35,181.91 and short-term capital gains of $447.29 from gross sales of stock for $25,489.09. The itemized deductions claimed on petitioners' Federal income tax return for 1972 were $12 for medical expenses, $1,403.33 for taxes, $2,924.78 for contributions, [10] $8,821.66 for interest, and $557.46 for miscellaneous deductions. *584 On Schedcule F of their 1972 return, petitioners set forth the following farm income statement: Sales of Market Livestock and Produce Raised and Held Primarily for Sale and Other Farm Income
Corn and Beans
$ 3,452.07
Other Farm Income
Agricultural program payments
254.40
Gunning Club dues
8,098.00
$11,804.47
Farm Expenses
Labor hired
$ 1,499.93
Repairs, maintenance
358.25
Rent of farm, pasture
1,000.00
Feed purchased
3,798.49
Fertilizers, lime
and seed
3,222.70
Gasoline, fuel, oil
1,064.13
Utilities
818.63
Conservation expenses
318.00
Groceries--Gun Club
749.83
Skilled labor
2,044.89
Decoys, repair
125.00
Laundry
90.45
Gun Club supplies
46.00
Repair storm damage
3,327.50
Repairs and supplies
2,895.84
Depreciation
3,734.00
$25,092.64 [sic]
Net Loss
$13,288.17
Depreciation
Depn.
Method
Depn.
Cost or
allowed
of
Rate(%)
for
Date
other
in prior
Com-
or life
this
Kind of Property
Acqd.
basis
years
puting
years
year
Buildings
$59,753
$15,569
SL
$2,146.00
Furniture and
fixtures
1969
228
46
SL
10
23.00
Machinery and
other equipment
16,671
11,535
SL
1,147.30
Ponds
1969/
1,730
224
SL
10
173.00
1970
Improvements
1969
1,036
208
SL
10
104.00
Decoys
1969
423
282
SL
3 yr.
141.00
Totals
$79,541 [sic]
$3,734.30
*585 In a letter dated March 6, 1973, to Mr. T. Allan Stradley of Traville Farm in Chestertown, Mr. Sparre in pertinent part wrote the following: We did not have the time to go into more details at the time, but I am most anxious to get your thoughts on what I might do to improve the profitability of the Farm. I have no interest in using it as a Hobby, but the place isn't big enough to justify massive investment. I would appreciate any ideas you may have about getting people with some imagination and ingenuity to send me ideas or, better still, come down and look at the place. What I need is experts to suggest ways to make the Farm more profitable.
I am not talking about just increasing yields and more fertilizer and all that * * *. We all know the land is not that good. What I really need is people to look at the place and say: 1. Add another barn and board horses for Delaware Park. 2. Raise Guinea Hens 3. Plant 20 acres in Black Walnut Trees. 4. Long Range Real Estate Development--Eventual sale and development of lots. 5. etc. etc. IMAGINATION AND INGENUITY TEMPERED WITH GOOD SENSE TO ADVISE APPROPRIATE ROUTES TO TAKE. I would be most appreciative *586 of any help you can give me in this area. Mr. Sparre also wrote Mr. Pat Caulk in a letter dated February 6, 1973, asking for advice of a similar nature. In a letter dated March 9, 1973, to Mr. Roger W. Simpkins, president of the Chestertown Bank of Maryland, Mr. Sparre wrote the following: We plan to move to Maryland permanently as a family in July, 1973 for many very pleasant and compelling reasons. There are also some real drawbacks: Daily commuting to Wilmington Significantly increased Real Estate Taxes Higher income taxes (personal). One of the main reasons for moving is to reduce expenses and to concentrate on making Jacobus Creek Farm and Gunning Club self supporting, maybe even pretty profitable. We all know it cannot be done with standard feed grain cash crops because of limited acreage, poor land, and the need to avoid high labor input. What I do need is some real imaginative and ingenuous thinking applied to the problem by people who know their business. What I need is for a variety of people to come down, take a look at the whole place, ask a lot of questions, go home to think and then suggest some non-traditional concepts. Here are some ideas *587 which I've heard, but do not feel smart enough to evaluate: 1. Board horses during the Delaware racetrack season. 2. Massive planting of Walnut trees. (I think time is the obvious disadvantage here). 3. Vacation spot for families None of these really grab you, do they? Do you have any people in your wide frame of reference who would be willing to come to take a look? Even if they go away, shaking their heads, it is essential that I get some new input. One thing I don't want to do is make it "millionaire gunning" unless it's the only option. In July of 1973, petitioners moved to the farm, selling their house in Wilmington. Mr. Sparre continued to work in Wilmington for DuPont. The move to the farm was made so that petitioners could gain control and reduce the costs of the grain crop and the gunning club.Additionally, petitioners felt they could not afford to keep both the farm and the Wilmington residence. Despite dramatic appreciation of the farm value, petitioners were cash-poor. Thus, upon sale of the Wilmington residence, they paid some debts and reduced their living costs. [11]
*588 In 1973, Mr. Sparre's salary from DuPont was $25,519.51. Dividends from stock ownership and trusts totaled $8,061.72, with $7,770.96 being taxable. Petitioners received $814.76 in interest. From the sale of stocks, petitioners had short-term capital losses of $10.48 on gross sales of $1,432.03 and long-term capital gains of $87,873.05 on gross sales of $104.369.18. The last of petitioners' DuPont stock was sold in 1973. From the sale of commodities, petitioners had a short-term capital gain of $2,409.24.From trust distributions, petitioners had short-term capital losses of $9.44 and long-term capital losses of $5.75. From the sale of land for a gross sales price of $5,000, petitioners had a long-term capital gain of $2,300. They also had $290 in capital gain distributions. Additionally, petitioners had either a small capital gain or a capital loss on the sale of their Wilmington residence for $53,000. [12] From two trusts, petitioners had income of $4,007.61. From four partnerships, they had $39,450.58 in losses plus $3,709 in additional first year depreciation. From State income tax refunds, petitioners received $848.50. *589 Their itemized deductions in 1973 were $12 for medical expenses, $2,215.94 for contributions, $3,161.88 for taxes, $11.218.10 for interest, and $558.50 for miscellaneous deductions. From the purchase of used property for $134.89 by one of the partnerships in which petitioners had invested, petitioners received an investment credit of $9.44. On Schedule F of their 1973 return, petitioners set forth the following farm income statement: Sales of Market Livestock and Produce Raised and Held Primarily for Sale and Other Farm Income
Soybeans
$ 2,126.75
Corn
2,317.58
Other Farm Income
Agricultural program payments
607.50
Timber
500.00
Gunning Fees [13]
7,700.00
$13,251.83
Farm Expenses
Labor hired
$ 1,387.28
Repairs, maintenance
2,698.96
Interest
23.71
Rent of farm, pasture
3,000.00
Feed purchased
916.92
Seed, plants purchased
422.49
Fertilizers, lime
2,397.76
Machine hire
98.00
Supplies purchased
485.71
Veterinary, medicine
71.50
Gasoline, fuel, oil
1,216.82
Taxes
134.12
Insurance
248.50
Utilities
445.46
Conservation expenses
1,707.60
Miscellaneous
619.30
Groceries - Gun Club
294.61
Decoys Expense
77.40
Contract farmer
4,086.00
Telephone
157.78
Depreciation
3,593.30
$24,083.22
Net Loss
$10,831.39
*590 Depreciation
Depn.
Cost or
allowed
Date
other
in prior
Kind of Property
Acqd.
basis
years
Buildings
$59,753
$17,715.00
Furniture and
fixtures
1969
228
69.00
Machinery and
other equipment
16,671
12,682.30
Ponds
1969/
1,730
397.00
1970
Improvements
1969
1,036
312.00
Decoys
1969
423
423.00
$79,841
Method
Depn.
of
Rate(%)
for
Com-
or life
this
Kind of Property
puting
years
year
Buildings
SL
Var.
$2,146.00
Furniture and
fixtures
SL
10
23.00
Machinery and
other equipment
SL
Var.
1,147.30
Ponds
SL
10
173.00
Improvements
SL
10
104.00
Decoys
SL
3
$3,593.30
Mr. Sparre in 1974 had Mr. Thomas Ashley, a registered timber buyer, evaluate the timber on the farm.Some time during the 1960's, petitioners planted some 24 acres of pine trees with the help of an 80 percent subsidy from the Federal Government Department of Agriculture. This 24 acres had been poor land to cultivate and Mr. Sparre hoped to realize a profit on selling *591 the relatively quick growing pines in 20 to 30 years. [14] He did this after speaking with a number of people knowledgeable on the question. An additional benefit from the 24 acres of pines was that their extensive root system resulted in improvement in some other acres of poor cultivation land. After speaking with Mr. Ashley, Mr. Sparre wrote the following memorandum dated September 8, 1974: Natural Resources - Jacobus Creek Farm
TIMBER
Assumptions: Todays Condition of Timber, Prices (Demand) Wholesale Removal (Harvest & Replant) Reference: Mr. Thomas Ashley, Registered Timber Buyer. (He wants first chance to buy.) Head of Still Pond Creek. Worton, Md. 21678 [SEE TABLE IN ORIGINAL] Pines: 15 yrs. old for pilings = $600+/acre 20 yrs. old for plywood = $576/acre Mixed Woods: Poplar & Oak & Walnut = $750+/acre (*Also HOLLIES) Pin Oaks: Luxury trees for estates. - $200 + EACH. In 1974, Mr. Sparre made numerous inquiries into the sale of the farm through subdivision. Such a sale was unlikely because of the local zoning *592 board and it remains so today, although Mr. Sparre is presently a member of that board. The fair market value of the land in 1974 was around $300,000. In 1974, petitioners changed farmers again. Mr. Sparre considered the farmer he had to be too set in his ways and petitioners no longer wanted to rent his adjacent land for the hunting club. The new farmer operated under a sharecropping arrangement. In 1974, the gunning club dues were reduced and the members were able to hunt only one day a week during the season. Mr. Coleman retired and Mr. Sparre felt that the quality club that Mr. Coleman had envisioned was too costly to operate at a profit. Mr. Sparre began to reduce the costs. Prior to 1974, petitioners deferred to Mr. Coleman's judgment and made no drastic reductions in the gunning club expenses. The first year that petitioners' farming and gunning operations lowered the net carrying cost of the property (costs directly attributable to holding the land) was 1974. In 1974, Mr. Sparre's salary from DuPont was $27,008.50. Dividends from stock ownership and trust funds totaled $5,967.06. From the sale of stock, petitioners had $40.40 in short-term capital losses from *593 gross sales of $780.63 and $391.05 in long-term capital gains from gross sales of $600. From trust distributions, petitioners had $3.43 in short-term capital losses and $453.22 in long-term capital losses. From partnerships and fiduciaries, petitioners received $31.76 in long-term capital gains. From two trusts and four partnerships, petitioners had a loss of $4,664.58. They received $1,279.54 in State income tax refunds and $40.00 from the Pennsylvania State Lottery. Their itemized deductions in 1974 were $2,177.55 for contributions, $3,307.09 for taxes, $12,447.27 for interest, $7,817 for miscellaneous deductions and $12 for medical expenses. From the purchase of new property for $10.33 and used property for $24.53 by a partnership in which petitioners participated, they received an investment credit of $1.88. On Schedule F of their 1974 return, petitioners set forth the following farm income statement: Sales of Market Livestock and Produce Raised and Held Primarily for Sale and Other Farm Income
Vegetables
$ 2,115.13
Grain
6,913.00
Other Farm Income
Gunning fees
3,750.00
$12,778.13
Farm Expenses
Labor hired
$ 1,110.99
Repairs, maintenance
1,549.45
Feed purchased
62.70
Seed, plants purchased
568.69
Fertilizers, lime
2,430.68
Supplies purchased
180.82
Gasoline, fuel, oil
310.18
Insurance
134.00
Utilities
180.31
Conservation expenses
250.00
Provisions for
gunning club
205.18
Telephone
113.94
Ducklings
500.00
Miscellaneous
1,906.40
Depreciation
2,162.00
$11,665.34
Net Profit
$ 1,112.79
*594 Depreciation
Depn.
Method
Depn.
Cost or
allowed
of
Rate(%)
for
Date
other
in prior
Com-
or life
this
Kind of Property
Acqd.
basis
years
puting
years
year
Buildings
Var.
$59,753
$19,861.00
SL
Var.
$ 715
Furniture and
fixtures
1969
228
92.00
SL
10
23
Machinery and
other equipment
16,671
13,829.60
SL
Var.
1,147
Ponds
1969/
1970
1,730
570.00
SL
10
173
Improvements
1969
1,036
416.00
SL
10
104
Decoys
1969
423
423.00
SL
3
$79,841
$2,162
Over the years, petitioners have looked into the following alternative sources of income for the farm: (1) recreation such as a trailer park, (2) goats, (3) sheep, (4) cattle, (5) catfish or sport fishing. Each of these ideas either proved impractical when tried or was abandoned before placed in operation. Throughout the years, approximately 80 acres of the farm have been used for raising crops. Petitioners have never attempted to sell the gravel located on the land.
Mr. Sparre's original retirement plan called for early retirement in around 1978 at age 58; however, he has changed that plan and plans to retire around 1980 *595 at age 60 with a pension of around $14,000 a year from DuPont. Although petitioners originally planned to retire to the farm permanently, they now expect eventually to sell the farm. Life on the farm has proved to be more difficult than petitioners desire for their retirement years. Petitioners have suffered some of their losses on the farm because of uncontrollable outside influences such as droughts and hurricane Agnes in 1971.There have never been any recreational facilities, such as a swimming pool, on the farm since petitioners purchased it in 1961. At the time of trial in 1979, the fair value of the property was around $500,000 and petitioners still resided there. There are 500 to 700 farms averaging around 200 acres each in Kent County. Very few of the 500 to 700 farms are owned by individuals who have no other source of income besides the farm. In 1979, 95 percent of the farmowners in Kent County had gunning operations. Gunning remains the second most important aspect in valuing a farm in Kent County. Perhaps only 10 to 12 of the farms in Kent County had operations like petitioners which provided room and board for the club members. Perhaps 50 percent of the gunning *596 operations are day rentals for around $40 a day per person. Of the other 50 percent, most rent to large commercial hunting operations. Less than 5 percent run their own clubs as petitioners do. None of the large commercial operations provide overnight accommodations. During the years that petitioners owned the farm, Mr. Sparre kept all records of expenditures and income. Mr. Sparre would turn them over at the end of the tax year to his father-in-law, an investigator for the State of Maryland Sales Tax Division, who would tabulate the expenditures and income on ledgers. The ledgers were then turned over to a Certified Public Accountant to do the final work. In the notice of deficiency for the taxable years 1971 and 1972, respondent disallowed petitioners' farm losses with the following explanation: It is determined that the losses of $24124.00 and $13288.00 claimed as losses from the operation of a farm for the years 1971 and 1972 respectively are not deductible under Section 183 or any other section of the Internal Revenue Code. OPINION The question presented is whether petitioners' Jacobus Creek Farm grain and gunning operation was an "activity * * * not engaged *597 in for profit" under section 183(a). Section 183(a) states that no deduction attributable to an activity not engaged in for profit shall be allowed an individual except as provided in section 183(b). Section 183(b) allows deductions otherwise allowable under Chapter 1B and deductions which would be allowable if such activity were engaged in for profit to the extent the gross income derived from such activity exceeds the deductions otherwise allowable under Chapter 1B. Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." [15]
*598 Whether petitioners' farm activity constitutes a trade or business for purposes of section 162, or whether petitioners engaged in activities for the production or collection of income or for management, conservation or maintenance of property held for the production of income for purposes of section 212(1) or (2), depends upon whether their predominant purpose for engaging in the venture was that of making a profit. Allen v. Commissioner, 72 T.C. 28, 33 (1979). Whether petitioners' farm activity was engaged in for profit is to be determined by reference to objective standards, looking to all the facts and circumstances of the case. Greater weight is accorded the objective facts than petitioners' mere statement of intent. A reasonable expectation of profit is not necessary, but the facts and circumstances must indicate that petitioners continued the farm activity in 1971 1972 with the objective of marking a profit. Section 1.183-2(a), Income Tax Regs.[16]
*599 Section 1.183-2(b), paragraphs (1) through (9), Income Tax Regs., lists as some of the relevant objective factors to be considered in determining whether an activity is egaged in for profit: (1) the manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his advisers, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or loss with respect to the activity, (7) the amount of occasional profits, if any, which are earned, and (9) elements of personal pleasure or recreation. [17]
*600 After examining all the facts and circumstances of the instant case, particularly as they relate to the factors set forth in section 1.183-2(b), Income Tax Regs., we find that petitioners' activity with respect to the Jacobus Creek Farm was a trade or business engaged in for profit under section 162. When Mr. Sparre purchased the land in 1961, he had three separate but interrelated reasons for purchasing the property: First, was his desire to retire to the farm; second, was his desire that the farm operations would provide a supplemental income source, at least by this time of his expected retirement at age 58 in 1978; and third, was his expectation that the land would appreciate greatly over the coming years. The question presented, however, is not why petitioners purchased the land in 1961, but why they operated the gunning club and grain crop operations in 1971 and 1972, especially in light of the continuous losses in each year following the purchase of the farm in 1961. Respondent maintains that the farm activity was engaged in by petitioners to enhance the value of the property and to improve the property making it suitable for petitioners' retirement *601 home. Petitioners maintain that the farm activity was a trade or business engaged in for profit. [18]
Section 1.183-1(d)(1), Income Tax Regs., [19] provides that in order to determine whether section 183 applies, the activity or activities of the taxpayer must be ascertained since where a taxpayer is engaged in several undertakings each may constitute a separate activity or the several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all of the facts and circumstances of the case must be examined. Generally, the most significant facts and cirkcumstances in determining whether more than one undertaking is one activity or more than one activity are the organizational and economic interrelationship of the undertakings, the business purpose of carrying on the undertakings *602 separately or together in a trade or business or in an investment and the similarity of the undertakings. Generally, a taxpayer's characterization of activities will be accepted unless it is artificial and cannot be reasonably supported. When a taxpayer engages in separate activities, deductions and income from each are not aggregated in determining whether an activity is for profit or in applying section 183. *603 Under the facts of this case, we conclude that the grain farming and the gunning club represent a single activity. Respondent does not argue to the contrary. Respondent, however, contends that the farming operation, including the gunning, is a separate activity from holding the property for its appreciation. Section 1.183-1(d)(1), Income Tax Regs., further provides that where land is purchased or held primarily with an intent to profit from its increase in value and the taxpayer also farms the land, the farming and holding of the land ordinarily will be considered a single activity only if the farming reduces the net cost of carrying the land (i.e., cost directly attributable to holding the land, such as interest on the mortgage, property taxes or depreciation of improvements). Petitioners argue that holding the land and the farming operation should be considered one activity depsite the stipulated fact that the net carrying costs of the land were never reduced by farm operations. They argue that the rule found in the regulation is not applicable in the instant case because, although they expected the property to appreciate in value over the years, *604 the property was not purchased or held primarily with an intent to profit from its increase in value. Petitioners had three strong reasons for purchasing and holding the land: (1) a retirement home, (2) income, and (3) appreciation of property. Thus, petitioners were not primarily holding the land for a profit from appreciation. Under these circumstances the regulation does not prohibit considering the farming activities and the holding of the land for appreciation as one activity. See Engdahl v. Commissioner,72 T.C. 659, 668 n. 4 (1979). Respondent does not suggest that petitioners held the property or operated the farm for recreational or hobby purposes, and the record is clear that they did not. Compare Benz v. Commissioner,63 T.C. 375, 385 (1974), wherein such a hobby motive was found in holding that section 183 applied in the raising, training and breeding of German shorthaired pointers by the taxpayer. Respondent, however, does argue that petitioners' expenditures in operating the farm were made to improve the farm so that it would be suitable for their retirement. While petitioners clearly improved the house during the years in *605 which they operated the farm, the expenditures for those improvements were capitalized and only a small percent of the depreciation applicable to the house was considered an expense of the gunning club. [20] The total depreciation deductions were relatively small as compared with the other farm expenses, e.g., $3,661 of $33,335 of 1971 farm expenses were depreciation expenses. The vast majority of expenses simply have no relation to the retirement home, except as they were spent to enable petitioners to have an income supplement in their retirement years. Although petitioners might have been able to operate the farm in a more efficient manner, overall petitioners did operate the farm in a businesslike manner. Mr. Sparre kept all of the books and paid the bills. At the end of the year, he turned over all of the records to his father-in-law, an investigator for the State of Maryland Sales Tax Division. The ledgers tabulated by his father-in-law were turned over *606 to a Certified Public Accountant who did the final work on them for tax purposes. Mr. Sparre consulted with farming experts in the Kent County community before purchasing the property. He had Mr. Coleman, an acknowledged expert in farming, as the manager of the farm. He followed Mr. Coleman's advice in purchasing the farm and in running the farm. For instance, the high quality gunning club was Mr. Coleman's idea. Mr. Sparre periodically suggested changes to lower costs, such as those suggested in his 1970 letter to Mr. Coleman. He looked into other farm undertakings, such as fishing, which could produce more income. Over the years, he wrote numerous experts for their suggestions on how to operate a successful farm and whether a successful farm could be operated on his property. Although the responses to his inquiries were not overly optimistic, they did encourage Mr. Sparre to continue in his efforts.Petitioners did not withdraw from other activities to focus on producing a profit on the farm operations; however, they did spend weekends at the farm after 1966 and Mr. Sparre did monitor the farm operations, constantly trying to improve them. Twice over the years petitioners *607 have changed farmers because they were dissatisfied with the previous arrangement. Petitioners' constant losses in the operation of the farm have been more than offset by the appreciation of the property. As of 1972, petitioners had total farm losses of around $135,000 and the property was worth around $260,000 more than they had paid for it in 1961.In fact, part of the reason petitioners expended the sums they did in operating the grain farm and gunning club was to cause the property to appreciate. In Kent County, the two most important factors in valuing farm property are the hunting operation and the grain yield. While hindsight seems clear that petitioners' expenditures with respect to the high quality gunning club were unwise, it is equally clear that petitioners made those expenditures in a good faith effort to make the farm profitable. See Babbitt v. Commissioner,23 T.C. 850, 867 (1955).
In the first years of operation, petitioners' financial status was such that their dividend income and salary covered the farm losses without substantial hardship. By the 1970's, however, petitioners' farm losses were a substantial hardship, having risen much faster *608 than their income. In fact, by 1974 petitioners decided to move to the farm because they were of the opinion that they could not afford to keep the house in Wilmington and the farm. The move created other hardships as Mr. Sparre continued to work in Wilmington and was by no means a move for petitioners' personal pleasure. Thus, under all the facts and circumstances of the instant case, we find that petitioners, despite losses in each year from 1961 through 1972, operated the farm in 1971 and 1972 with the intent to profit from a trade or business as required under sections 162 and 183. See Babbitt v. Commissioner,supra at 850, wherein we found for the taxpayer under facts and circumstances quite similar to those here present. [21]
Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
2. Mr. Coleman sent Mr. Sparre a letter dated January 17, 1961, which in pertinent part read as follows: After talking to you last night I remember several other things. Most important is income, on one end of the farm in a part of the woodland is a gravel pit which has been approved by the state of Md. & is the type of gravel which builds roads. Now this pit looks to me to be 5 or 6 hundred yards sq. & app. 15 feet deep. I have no idea how many tons would be in this area but it would be considerable if you decided to sell this gravel. I understand it brings 25-50" a ton in the bank, "gravel bank." As for the gunning. You said you would not be able to gun anymore so I thought this would not be too attractive to you. So I didn't mention anything about this. All kidding aside this does look like a good setup for a small club or a couple persons. With a little work and promotion this probably could be rented for a fair sum. After you get finished all this renting and farming you can also go down in the marsh to catch yourself a muskrat, if you like muskrats. * * *↩
3. In 1961 petitioners received the following dividend income: ↩
American Electric Power Co.
$ 241.30
E.I. DuPont
6,045.00
General Electric Co.
46.00
Gulf Oil Corp.
108.90
Houston Lighting and Power Co.
192.00
National Dairy Products Corp.
200.00
Chas. Pfizer & Co.
198.90
Phillips Petroleum
255.00
Standard Oil Co., N.J.
276.00
E.I. DuPont
1,350.00
TOTAL
$8,913.10
4. Although Mrs. Sparre did try to become licensed in electrolysis to add to the family income in 1974, she received no salary income from 1961 through at least 1974.↩
5. The same items were depreciated in 1962 as in 1961. See page 9, supra↩. 6. In 1961, petitioners treated the interest paid with respect to the farm as a farm expense of $1,010.55, but in 1962 all interest expenses of petitioners were deducted as interest without treating them as farm expenses. Although this change did not alter the total taxes paid in 1962, it did reduce the loss from farm operations as computed.↩
*. Illegible↩
**. Illegible↩
7. 1969 is the first year since 1961 in which petitioners listed interest on loans made with respect to the farm as a farm expense deduction. In the other years, the deduction was taken as an itemized deduction. See note 6, supra↩.
*. Productive, but farmer resented additional time consumed on hillsides, etc. The presumed advantage was to reduce tilling expense.↩
*. Productive, but farmer resented additional time consumed on hillsides, etc. The presumed advantage was to reduce tilling expense.↩
8. The parties stipulated that in 1971 seven full-time club members paid $1,150 each and one part-time member paid $400, and that in 1972 one full-time member paid $1,200, five full-time members paid $1,150 each, three part-time members paid $600 each and one part-time member paid $400. These figures, however, produce a much higher gunning club income than that found on the 1971 and 1972 tax returns, Schedule F.No explanation is offered by the parties.↩
9. In addition to the challenge of the farm expenses, respondent's deficiency notice challenges the 1971 income and deductions of petitioners on the amount of capital gain on sale of a residence. This question, however, was settled by the parties and is not before this Court. See note 6, infra↩.
10. In addition to the challenge of the farm expenses, respondent's notice of deficiency also raised the taxes paid by $12 and lowered the contribution by $148. These questions, however, were settled by the parties and are not before this Court.↩
11. With the move to the farm, petitioners lowered their allocation of maintenance expenses for business from 50 percent to 20 percent.↩
12. No mention was made of the house on petitioners' original return, but respondent in his notice of deficiency determined a gain of $2,046 for sale of that property in 1971. No explanation of the 1971 date is given in the record before us and the question of gain on the sale of the house is not raised in this case, having been settled prior to trial. During trial, Mr. Sparre testified that he sold the house at a loss of around $20,000 and the parties have stipulated that petitioners moved to the farm in July of 1973.↩
13. In 1973, two members defaulted on their club membership payments. This did not happen in any other year.↩
14. There was also the possibility of selling the pines as veneer after 50 years for a greater profit.↩
15. Sections 183 (a) through (c) read as follows: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.↩
16. Section 1.183-2(a), Income Tax Regs., reads as follows: SEC. 1.183-2.Activity not engaged in for profit defined. (a) In general. For purposes of section 183 and the regulation thereunder, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. Deductions are allowable under section 162 for expenses of carrying on activities which constitute a trade or business of the taxpayer and under section 212 for expenses incurred in connection with activities engaged in for the production or collection of income or, for the management, conservation, or maintenance of property held for the production of income. Except as provided in section 183 and section 1.183-1↩, no deductions are allowable for expenses incurred in connection with activities which are not engaged in for profit. Thus, for example, deductions are not allowable under section 162 or 212 for activities which are carried on primarily as a sport, hobby, or for recreation. The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. In determing whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. Thus it may be found that an investor in a wildcat oil well who incurs very substantial expenditures is in the venture for profit even though the expectation of a profit might be considered unreasonable. In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent.
17. Section 1.183-2(b), Income Tax Regs., reads as follows: (b) Relevant factors. In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account.No one factor is determinative in making this determination. In addition, it is not intended that only the factors described in this paragraph are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors (whether or not listed in this paragraph) indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa. Among the factors which should normally be taken into account are the following: (1) Manner in which the taxpayer carries on the activity. The fact that the taxpayer carries on the activity in a business-like manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated. A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive.
(2) The expertise of the taxpayer or his advisors. preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Where a taxpayer has such preparation or procures such expert advice, but does not carry on the activity in accordance with such practices, a lack of intent to derive profit may be indicated unless it appears that the taxpayer is attempting to develop new or superior techniques which may result in profits from the activity. (3) The time and effort expended by the taxpayer in carrying on the activity. The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity. (4) Expectation that assets used in activity may appreciate in value. The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. See, however, paragraph (d) of section 1.183-1 for definition of an activity in this connection. (5) The success of the taxpayer in carrying on other similar or dissimilar activities. The fact that the taxpayer has engaed in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. (6) The taxpayer's history of income or losses with respect to the activity. A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. A series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit. (7) The amount of occasional profits, if any, which are earned. The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated. (8) The financial status of the taxpayer. The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit expecially if there are personal or recreational elements involved. (9) Elements of personal pleasure or recreation.↩ The presence of personal motives in [the] carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits. For example, the availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit. An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph.
18. Alternatively, petitioners argue that the farm activity was engaged in for the management, conservation or maintenance of the farm property, which was held for the production of income. Since we find for petitioners on their first argument, we do not reach the question of whether the property was held for the production of income.↩
19. Section 1.183-1(d)(1), Income Tax Regs., reads as follows: (d) Activity defined--(1) Ascertainment of activity↩. In order to determine whether, and to what extent, section 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained. For instance, where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183. Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding or the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land).
20. The small portion of the depreciation applicable to the house improvements claimed in connection with the gunning club for overnight accommodations has not been questioned by respondent and appears reasonable.↩
21. Although sec. 183 was enacted to apply to post-1969 profit-motive inquiries, the pre-1969 case law remains relevant. Jasionowski v. Commissioner,66 T.C. 312, 321↩ (1976).